Keith A. BOUDREAUX, Plaintiff,

v.

AMERICAN WORKOVER, INC., et al., Defendants.

AWI, INC., Defendant, Third-Party Plaintiff-Appellant,

v.

AMERICAN INSURANCE CO., Third-Party Defendant-Appellee.

No. 80-3287.

United States Court of Appeals, Fifth Circuit.*

Unit A

July 6, 1982.

---

* Former Fifth Circuit case, section 9(1) of Public Law 96–452—October 14, 1980.

Wood Brown, III, New Orleans, La., for AWI, Inc.

Dillon & Cambre, Gerard M. Dillon, New Orleans, La., for American Ins. Co.

Joshua T. Gillelan, II, Dept. of Labor, Washington, D. C., for amicus curiae Director, Office of Workers' Compensation Program.

Before BROWN, CHARLES CLARK, GEE, RUBIN, GARZA, REAVLEY, POLITZ, RANDALL, TATE, SAM D. JOHNSON, WILLIAMS and GARWOOD, Circuit Judges.

TATE, Circuit Judge:

The sole issue before this court is whether an employee injured while performing marine petroleum exploration and extraction work aboard a drilling vessel located offshore but on state territorial waters is engaged in "maritime employment" within

the meaning of section 2(3) of the Long-shoremen's and Harbor Workers' Compensation Act ("LHWCA" or "Act"), 33 U.S.C. § 902(3), as amended in 1972.

The question arises in a suit by an amphibious workman against a vessel defendant for damages resulting from injuries caused by the vessel's negligence. The vessel defendant appeals the dismissal of its third-party demand against the workman's employer for indemnification insofar as the injuries were caused by the employer's fault. The precise issue is whether the employer is immune from the indemnification demand as an employer covered by the LHWCA; it is contended that the employer should be denied this immunity because its employee, although injured by maritime tort on a vessel in navigable waters, was nevertheless not in "maritime employment" and thus not covered by the Act.

A panel of this court, in a split decision, held that the work involved was indeed "maritime employment" within the meaning of the LHWCA. *Boudreaux v. American Workover, Inc.*, 664 F.2d 463 (5th Cir. 1981). Rehearing en banc was granted. 664 F.2d 480 (5th Cir. 1982).

On rehearing, we reach the issue expressly reserved in *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 266 n.25, 97 S.Ct. 2348, 2358 n.25, 53 L.Ed.2d 320 (1977): "whether Congress excluded people who would have been covered before the 1972 amendment; that is, workers who are injured on navigable waters as previously defined."

For reasons to be set forth more fully, we find no Congressional intent to withdraw the coverage of the Act from those injured on navigable waters while engaged in what was considered as "maritime employment" for LHWCA purposes prior to the 1972 amendments.[1] We, therefore, like the panel, affirm the district court's determination in favor of the Act's coverage of this maritime injury.

*Facts and Procedural Context*

The issue before us arises in the following factual and procedural context, which is more fully detailed in the panel opinion:

The plaintiff Boudreaux was injured over navigable waters in the course of his employment.[2] His employer ("Aquatek") was a contractor performing specialty mineral-production work on a drilling barge. Boudreaux sued the owner and operator ("AWI") of the drilling barge for its negligent failure to provide him with a safe place to work.[3]

The district court dismissed a third-party demand by the defendant AWI (the owner and operator of the *vessel*) against Aquatek (the *employer*) for contribution or indemnity—in the event Boudreaux recovered against Aquatek—based on Aquatek's al-

---

1. We further note (see part VII of this opinion) that the present injury is covered under the amended Act even under the test of "maritime employment" adopted by some post-1972 decisions that, even though the injury occurs on navigable waters, the duties of the employment in which injured must have a significant relationship to traditional maritime activity. *See, e.g., Weyerhaeuser v. Gilmore*, 528 F.2d 957, 961 (9th Cir. 1975), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976). Coverage of the Act on this basis was upheld by the panel majority in the present appeal and, under similar facts, by another panel of this court in *Pippen v. Shell Oil Co.*, 661 F.2d 378 (5th Cir. 1981). (We stayed the issuance of the mandate in *Pippen* pending our present decision on en banc rehearing.)

2. Boudreaux's accident occurred in Louisiana's territorial waters. Had it occurred on the outer continental shelf, *beyond* state waters, then Boudreaux unquestionably would have been covered by the LHWCA pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(b), which specifically extends LHWCA coverage to employees there injured in operations conducted for the purpose of exploring for, developing, removing or transporting the natural resources of the subsoil and seabed of the outer continental shelf.

3. Boudreaux was paid LHWCA compensation payments by the insurer of his employer, Aquatek. As amended in 1972, the Act permits an injured employee to bring suit for negligent injury against third-person vessel parties, section 905(b), 33 U.S.C. § 905(b), subject to employer's right to be reimbursed from any damage recovery for benefits paid, *id.* section 933, 33 U.S.C. § 933. The employer's insurer did, in fact, intervene herein to assert its claim for reimbursement.

leged contributing negligence. The district court thus upheld the contention of the employer that, since it was liable to Boudreaux for LHWCA compensation, it was protected from contribution or indemnity to the vessel by section 5(b) of the Act, 33 U.S.C. § 905(b) (quoted in note 9 below). This enactment, added by the 1972 revision, expressly provides that an employer of an injured workman covered by the Act shall not be liable to the vessel "directly or indirectly" for any injuries caused to its employee by the negligence of the vessel.

Thus, in the context of this litigation, the central issue—whether Boudreaux is covered by the LHWCA as amended in 1972, so as to be entitled to the compensation now being paid to him by his employer's insurer (see note 3)—concerns whether a maritime employer, as so recognized for LHWCA purposes prior to the 1972 amendments, is to be denied the immunity from liability for contributing to negligence-caused injury to its employee,[4] an immunity expressly intended by the 1972 amendments to be accorded to employers of persons entitled to LHWCA compensation because of injury in maritime employment. It also concerns whether the 1972 amendments withdrew coverage from pre-1972 maritime employees injured on the waters.

### I. The 1972 Statutory Provisions

Prior to 1972 a single situs requirement of the LHWCA governed the scope of its coverage. That requirement limited coverage to workers whose "disability or death result[ed] from an injury occurring upon the navigable waters of the United States (including any dry dock). . . ." LHWCA of 1927, ch. 509, § 3(a), 44 Stat. 1426. The Supreme Court decided that a worker who in the course of his duty was obliged to go on navigable waters, however briefly or sporadically, and who suffered an injury while in that historically maritime locality, was covered by the pre-1972 LHWCA. *Calbeck v. Travelers Insurance Co.*, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962). *See* Gilmore and Black, The Law of Admiralty, § 6–19 (esp. at 421–22) (2d ed. 1975); 4 Larson, The Law of Workmen's Compensation, § 89.23(b) (esp. at 16–168, 169) and § 89.26 (1982).

Under the 1972 revision of the LHWCA, with its express intent to move the coverage landward (see II below), this simple test (generally, injury on the navigable waters) was modified. By the 1972 amendments to that Act, to be entitled to its benefits, a disabled employee must (a) be disabled as the result of "an injury occurring upon the navigable waters of the United States" (defined as also including adjoining areas), section 3(a) of the Act, 33 U.S.C. § 903(a)[5]—the "situs" test; and (b) be engaged in "maritime employment" at the time of the injury, section 2(3) of the Act, 33 U.S.C. § 902(3)[6]—the "status" test.

---

4. *See Miller v. Central Dispatch, Inc.*, 673 F.2d 773, 784 (5th Cir. 1982); *Aparicio v. Swan Lake*, 643 F.2d 1109 (5th Cir. 1981).

5. 33 U.S.C. § 903(a) provides:
   Compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel). . . .
   The remainder of the section provides that no LHWCA compensation shall be payable in respect of the disability or death of a master or member of the crew, of a person engaged by a master to load or unload or repair any small

vessel under eighteen tons, or any governmental officer or employee.

6. 33 U.S.C. § 902 relevantly provides:
   When used in this chapter—
   \* \* \* \* \* \*
   (3) The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harborworker including a ship repairman, shipbuilder, and shipbreaker, but such term does not include a master or member of a crew of any vessel, or any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.
   (4) The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United

These 1972 requirements for coverage under the Act have been at issue before the United States Supreme Court in three of its decisions. Two of them directly involved the issue of whether land-based employees, not covered by the LHWCA prior to the 1972 revision, were engaged in "maritime employment" at the time of their injuries: *P. C. Pfeiffer Co. Inc. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979) and *Northeast Marine Terminal Company, Inc. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). In both of these, coverage was upheld, affording the Act a liberal construction in view of its remedial purpose. Although the issue in the third decision, *Sun Ship, Inc. v. Commonwealth of Pennsylvania*, 447 U.S. 715, 100 S.Ct. 2432, 65 L.Ed.2d 458 (1980), was peripheral to the present, that decision nevertheless affords persuasive support to our ultimate conclusion that the 1972 revision was not intended to withdraw from amphibious workers beneficial rights to a worker's compensation remedy previously permitted or enjoyed by them under the LHWCA prior to its 1972 revision.[7]

*Caputo* and *Ford*, the first two decisions, concerned land-based employees newly covered by the 1972 revision. They analyzed the 1972 amendments of the LHWCA as "replacing the single situs requirement [*i.e.*, on navigable waters or their statutory equivalent] with a two-part situs and status standard." *Ford, supra*, 444 U.S. at 73–74, 100 S.Ct. at 332; *Caputo, supra*, 432 U.S. at 264–65, 97 S.Ct. at 2357. "To be eligible for compensation, a person must be an employee [status] as defined by § 2(3) [33 U.S.C. § 902(3)] who sustains injury on the situs defined by § 3(a) [33 U.S.C. § 903(a)]." *Ford*, 444 U.S. at 74, 100 S.Ct. at 333. Situs turns on geography; status on the maritime-connected nature of the job. *Id.*, 444 U.S. at 73–83, 100 S.Ct. at 333–37; *Caputo*, 432 U.S. at 265, 97 S.Ct. at 2358–63. Thus, both the status requirements, as defined by

section 902(3), based on the nature of the job, and the situs requirements, as defined by section 903(a), based on geography, must be satisfied before the LHWCA can apply. *Ford*, 444 U.S. at 73–74, 100 S.Ct. at 332–33 (1979); *Caputo*, 432 U.S. 265, 97 S.Ct. at 2357.

We must note, however, that the issue as to "maritime employment" in *Caputo* and *Ford* was with regard to land-based employees on the expanded waterfront situs of compensable accidents added by the 1972 amendment, as to whom the "maritime employment" test was designed to confine the remedy to employees in maritime-connected industries and to exclude from coverage non-maritime employees within the expanded shoreward zone. *See* legislative purposes in II below. The Court was there not concerned with employees injured on the actual navigable waters, who were at the time of the 1972 revision already considered to be in maritime employment for purposes of the LHWCA. (Indeed, in *Caputo*, the Court expressly noted that its opinion did not concern persons covered before the 1972 amendment who were injured on navigable waters. 436 U.S. at 266 n.25, 97 S.Ct. at 2358 n.25.)

It is conceded that the present injured worker, Boudreaux, was engaged in employment at the time of the accident that was compensable under the LHWCA prior to the amendment as occurring on the navigable waters. *See Calbeck v. Travelers Insurance Company, supra*. We have examined the legislative history and purposes of the 1972 revision (see II below) and the jurisprudential context in which it occurred (see III below), and we find no intention to dilute the pre-1972 meaning of "maritime employment", with regard to employees actually injured on navigable waters, as including all employees required to work on such waters as part of their duties. *See, e.g., Nalco Chemical Corporation v. Shea*,

States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel).

7. We discuss this decision more fully in VI below.

419 F.2d 572 (5th Cir. 1969). Thus, we will conclude, an employee injured on the waters in the course of his employment satisfies the 1972 revision's "maritime employment" test, because employment on the water *is* "maritime employment" within the meaning of the LHWCA both before and after its 1972 revision. It therefore satisfies (when injury occurs on the waters) the 1972 "status" test as well as the "situs" test.

We must note here, by way of limitation, that no pre-1972 LHWCA case that we could discover involved the coverage of a person whose employment took him merely transiently or fortuitously to a maritime locus where he was injured, where otherwise except for this isolated incident his employer's business was both land-based and unconnected with maritime-related employment.[8] We express no opinion as to coverage of such a person, an issue not posed by the facts before us.

Before turning to the legislative purposes of the 1972 revision of the Act, we must note the approach established by the Supreme Court in its opinions. This approach to construction of the 1972 revision should, we think, guide judicial interpretation of the changes in the Act accomplished by that revision.

With regard to the landward extension of coverage, the Court stated that the "language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage," *Caputo, supra,* 432 U.S. at 268, 97 S.Ct. at 2359, and that the decision to focus on the nature, not location of employment "also serves the broader congressional purpose of expanding coverage. Congress intended to apply a simple, uniform standard of coverage." *Ford, supra,* 444 U.S. at 83–84, 100 S.Ct. at 338. *Caputo* stressed that this "remedial legislation 'must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results.'" *Id.* The third post-1972 decision, *Sun Ship, supra* (to be discussed more fully in VI below), involved an attempt, similar to the present, to construe the expanded coverage provisions of the 1972 revision as likewise somehow having the effect of overruling interpretations of the 1927 Act that were beneficial to covered employees.

In rejecting the effort to deduce such an intent from the amendments (that were designed to *expand* coverage), the Court found to be significant, and indeed determinative, the absence in the legislative history of the slightest intimation of any intent to affect prior jurisprudential interpretations with respect to pre-existing coverage afforded by the Act to employees injured in waterfront and seaward accidents. 447 U.S. at 719–22, 100 S.Ct. 2436–37.

## II. *Legislative Purposes and History of 1972 Amendments*

In 1972, the Congress amended the LHWCA of 1927, P.L. 92–576, 86 Stat. 1251, Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972. The expansion of coverage landward, and the consequent addition of the "maritime employment" requirement, were merely part of this 1972 revision, described by *Caputo* as "the first significant effort to reform the 1927 Act and the judicial gloss that had been attached to it." 432 U.S. at 261, 97 S.Ct. at 2356. As there stated, *Id.*:

**8.** Possible exceptions to this characterization of the prior jurisprudence are *Parker v. Motor Boat Sales, Inc.,* 314 U.S. 244, 62 S.Ct. 221, 86 L.Ed. 184 (1941) and *Ellis v. Gulf Oil Corp.,* 48 F.Supp. 771 (D.N.J.1943), where land-dutied employees whose work had never before taken them on the water were nevertheless allowed LHWCA compensation for death resulting from injury on the navigable waters. For present purposes (since it is unnecessary to decide the broader issue), *Parker*—where an entirely land-based employee of a small boat sales company was drowned while accompanying another employee testing a motor boat on an inland river—can be construed as concerning an employer covered by the Act insofar as maritime injuries because some of his employees from time to time tested boats on the water in the course of their employment.

The pre-1972 Act, 33 U.S.C. § 902(4), as does the present, 33 U.S.C. § 902(4) (quoted in note 6), pertinently described an employer covered by the Act as one "any of whose employees are engaged in maritime employment, in whole or in part, upon the navigable waters of the United States * * *."

The main concern of the 1972 Amendments was not with the scope of coverage but with accommodating the desires of three interested groups: (1) shipowners who were discontented with the decisions allowing many maritime workers to use the doctrine of "seaworthiness" to recover full damages from shipowners regardless of fault; (2) employers of the longshoremen who, under another judicially created doctrine, could be required to indemnify shipowners and thereby lose the benefit of the intended exclusivity of the · compensation remedy; and (3) workers who wanted to improve the benefit schedule deemed inadequate by all parties. To achieve the first two of these objectives, the final enactment provided, inter alia, (1) that the liability of the vessel was limited to those injuries caused by negligence and "shall not be based upon the warranty of seaworthiness," and (2) "that the employer [of the covered worker] shall not be liable to the vessel for such [damages caused by vessel negligence] directly or indirectly." Section 5(b), 33 U.S.C. § 905(b), as added by the 1972 amendments, P.L. 92–576, § 18.[9]

The legislation was enacted after committees of each House submitted full reports, each summarizing the general purposes of the legislation and containing a section by section analysis of the changes provided. Senate Report No. 92–1125, 92d Congress, 2d Session [hereinafter cited as "S.Rep.," followed by page number]; House Report No. 92–1441, *reprinted* in [1972] U.S. Code Cong. & Ad.News 4698 [hereinafter cited as "H.Rep.," with USCAN page number]. For instance, with regard to the section 905(b) changes, the reports specifically stated the intention to eliminate any unseaworthiness remedy against the vessel afforded longshoremen and other non-seamen working on board a vessel, and to eliminate any liability of their employer to the vessel for their own breach of duty contributing to the accident. S.Rep. at 2, 8–12, 25; H.Rep. at 4699, 4701–05, 4719. It is also of note that these legislative reports, in stating the reasons for the changes, specifically identify the Supreme Court decisions intended to be legislatively overruled, such as *Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) and *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099.[10]

We now turn specifically to the 1972 legislative revision of section 2(3), 33 U.S.C. § 902(3), quoted at note 6, and of section 3(a), 33 U.S.C. § 903(a), quoted at note 5. The former, it will be recalled, added the "maritime employment," or status, requirement for employees to be covered by the Act; the latter broadened coverage shoreward, to shoreside areas adjacent to navigable waters.

To accommodate the broadened shoreside situs, the former definition of "employer," section 2(4), 33 U.S.C. § 902(4) was amended to broaden the definition of a maritime-employment employer. Before the 1972

---

**9.** Section 5(b), 33 U.S.C. § 905(b) in full provides:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provision of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide ship building or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

**10.** These decisions had recognized the legislatively-overruled longshoremen's unseaworthiness remedy (*Sieracki*) and the legislatively-overruled right of the vessel (*Ryan*) to indemnity against the stevedore.

amendment, such an employer was defined with reference only to whether some of his employees worked, "in whole or in part, upon the navigable waters of the United States (including any dry dock)." After the amendment, the employer was defined as including the employer of those in maritime employment who worked, in whole or in part, upon the expanded shoreside areas as well as upon the navigable waters. As will be shown, because before 1972 the employee's work upon the navigable waters had been the simple test of maritime employment (see III below), a change in the definition of an "employee," section 2(3) was required in order to affirmatively define which employees in the expanded shoreside situs were now covered.[11]

These changes are interrelated. As the Supreme Court observed in *Caputo*, whereas before the 1972 amendments, "so long as the work-related injury occurred on navigable waters and the injured worker was not a member of a narrowly defined class,[12] the

worker would be eligible for federal compensation provided that his or her employer had at least one employee engaged in maritime employment"; however, "with the definition of 'navigable waters' expanded by the 1972 Amendments to include such a large geographical area, it became necessary to describe affirmatively the class of workers Congress desired to compensate." 432 U.S. at 264, 97 S.Ct. at 2357.

The reasons for the broadening of coverage to the shoreside areas by the section 3(a) amendment are well-documented in the legislative reports: "[C]overage of the present Act stops at the water's edge; injuries on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability depending on which side of the water's edge and in which State the accident occurs. To make matters worse, most State Workmen's Compensation laws provide benefits which are inadequate. * * *" S.Rep. at 12.[13] In explaining the broaden-

---

11. Before the 1972 amendment, the definition by section 2(4) simply provided:

The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any dry dock).

By the 1972 amendment, section 2(4) was amended to provide as definition:

The term "employer" means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (*including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel*). (Emphasis supplied.)

Prior to the amendment section 2(3), 33 U.S.C. § 902(3), defined "employee" negatively as follows:

The term "employee" does not include a master or member of a crew of any vessel, nor any person engaged by the master to load or unload or repair any small vessel under eighteen tons net.

The Act's coverage then resulted from an "injury" in the course of employment, section 2(2), 33 U.S.C. § 902(2), with an "employer," then defined in section 2(4), 33 U.S.C. § 902(4), as meaning "an employer, any of whose employees are employed in maritime employment, in whole or in part upon the navigable waters of the United States (including any dry dock)."

As noted, the amended section 2(3), as reported by the Senate and House committees and enacted unchanged, now defined "*employee*" affirmatively, see note 6 for full text, as "any person engaged in *maritime employment, including* any longshoreman . . . harborworker," etc. (Emphasis supplied.)

12. The Court in a footnote explains "this narrowly defined class" as referring to the LHWCA's exclusion of the master or member of a crew, of a person engaged by the master to load or unload or repair a small vessel under eighteen tons net, and of employees of the United States; noting that these exclusions are retained by the 1972-revised Act (see second paragraph of note 5, above).

13. In this regard, the Committee further observed:

It is apparent that if the Federal benefit structure embodied in Committee bill is enacted, there would be a substantial disparity in benefits payable to a permanently disabled longshoreman, depending on which side of the water's edge the accident occurred, if State laws are permitted to continue to apply to injuries occurring on land. It is also to be noted that with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore.
S.Rep. at 13.

ing of coverage to extend to shoreside areas adjacent to navigable waters, the report stated: "The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water.... The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity." S.Rep. at 13. The House report sets forth identical views in substantially similar language. H.R. at 4707–08.

The reason for the addition, by the 1972 amendment to section 2(3), of the "maritime employment" (or "status") requirement for coverage is not as explicit. Both legislative reports do state in identical language, in apparent reference to this change: "The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity.... Likewise the Committee has no intention of *extending* coverage under the Act to individuals who are not employed by a person who is an employer, *i.e.*, a person at least some of whose employees are engaged, in whole or in part in some form of maritime employment." S.Rep. at 13; H.Rep. at 4708 (emphasis supplied). Nevertheless, in the section by section analysis by which the legislative reports explain the reason for the changes, it becomes manifest in our opinion that the 1972 change in definition of an "employee," section 2(3),

was not intended to withdraw coverage from those previously considered to be in "maritime employment" for purposes of LHWCA coverage.

The 1972 revision originated as Senate Bill 2318. The Senate committee draft of an amended definition of "employee," section 2(3) of the Act, was enacted by both Houses without change. In explaining the change in definition, the Senate committee report specifically noted that the new definition "*does not exclude other employees traditionally covered*" (emphasis supplied).[14] S.Rep. at 16. The House committee report, although less explicit, states the new definition "includes any employee engaged in *maritime employment*, any longshoreman or other person engaged in longshoring operations, and any harborworker (including any ship repairman, shipbuilder, and shipbreaker)" (emphasis supplied).[15]

These committee reports of legislative purpose thus do not reflect any intention to withdraw the Act's coverage from injuries to workmen, such as Boudreaux, injured on navigable waters in the course of employment with an employer at least some of whose employees worked in whole or in part on navigable waters. In particular, the legislative reports do not question or even refer to the holding of *Calbeck, supra,* that the Act's coverage extended to "all injuries sustained by employees on navigable waters," 370 U.S. at 124, 82 S.Ct. at 1202— "a significant omission in light of the care which the [committee] reports took to identify Supreme Court cases to be overturned...." See *Sun Ship, Inc., supra,* 447

---

**14.** See full analysis of change in 2(3), S.Rep. at 16:

> Section 2(a) amended section 2(3) of the Act to define an "employee" *as any person engaged in maritime employment.* The definition specifically includes any longshoreman or other person engaged in longshoring operations, any harborworker, including a ship repairman, shipbuilder or ship breaker. *It does not exclude other employees traditionally covered* but retains that part of 2(3) which excludes from the definition of "employee" masters, crew members or persons engaged by the master to unload, load or repair vessels of less than eighteen tons net. (Emphasis supplied.)

**15.** See full analysis of change in 2(3), H.Rep. at 4711:

> Subsection (a) amends the definition of the term "employee" contained in section 2(3) of the Act. The present definition merely excludes from the definition of "employee" a master or member of a crew, or any person engaged by the master to load, unload, or repair any small vessel. The new subsection retains this exclusion and states that the term includes any employee engaged in maritime employment, any longshoreman or other person engaged in longshoring operations, and any harborworker (including any ship repairman, shipbuilder, and shipbreaker).

U.S. at 722, 100 S.Ct. at 2437. It is fair to say, we think, that a reading of the legislative reports, both overall and with specific reference to the "maritime employment" status test newly provided by the 1972 amendment to section 2(3), did not contemplate disturbing the previous *Calbeck* characterization of LHWCA-covered maritime employment as including amphibious workers injured on navigable waters.[16]

In 1962, *Calbeck* ended thirty-five years of confusing and unworkable judicial interpretations by its simple test that the Act covered all injuries on the navigable waters of employees whose employers employed one or more workers to labor on navigable waters. *See Sun Ship, supra*, 447 U.S. at 718, 100 S.Ct. at 2435. The 1972 legislative committee reports reflect no dissatisfaction with this rule, and it is not readily credible that the previous forty-five years of judicial interpretations culminating in *Calbeck* and its progeny were intended to be legislatively altered without any mention of this drastic change to restrict coverage of the Act.

We are reenforced in this view, not only by the silence of the legislative reports as to such an intent, but by the consistent explanation for the new provisions as "an *extension* of coverage to shoreside areas," S.Rep. at 12, H.Rep. at 4707 (emphasis supplied). The Senate Report in its "Summary" of the proposed legislation identifies its remedial purposes as "to upgrade benefits" and to "extend coverage to protect additional workers," S.Rep. at 1 (as well as to "resolve the longstanding dispute over third-party actions by injured longshoremen" by abolishing (see text at note 10) the unseaworthiness remedy and the vessel-indemnity against stevedores, S.Rep. at 2). The thrust of the summary is that the legislation was designed to broaden coverage and increase benefits.[17] We cannot find that *Calbeck's* well-accepted construction of the Act as covering injuries on navigable waters was silently overruled by a remedial statute designed to broaden coverage and "framed out of solicitude for the workers." *Sun Ship, Inc.*, 447 U.S. at 726, 100 S.Ct. at 2439. To do so, as the Court observed in a similar context, "would blunt the thrust of the 1972 amendments, and frustrate Congress' intent to aid injured maritime laborers." *Id.*

### III. *Jurisprudential Context of 1972 Amendments to the Act*

The jurisprudential context in which the 1972 amendments to the Act were enacted makes it plain that a person who suffered an injury that occurred on navigable waters, such as the present plaintiff Boudreaux, was considered to be in "maritime employment" for purposes of the Act. The Court has quite recently summarized this jurisprudential context. *See Ford, supra*, 444 U.S. at 73, 100 S.Ct. at 332, and *Sun*

---

**16.** Rather, the 1972 amendment was designed to provide a test when injury occurred in the extended shoreside locus newly provided by the 1972 revision by which to exclude those not employed in maritime-related activities. As the legislative reports state, in identical language: "Thus, an individual employed by a person none of whose employees work, in whole or in part, on navigable waters, is not covered even if injured on a pier adjoining navigable waters." S.Rep. at 13; H.Rep. at 4708.

**17.** The "Summary" of the proposed legislation ultimately adopted as the 1972 LHWCA revision is set forth in S.Rep. at 1–2:

The principal purpose of S. 2318 is to amend the Longshoremen's and Harbor Workers' Compensation Act in order to upgrade the benefits, extend coverage to protect additional workers, provide a specified cause of action for damages against third parties, and to promulgate necessary administrative reforms.

. . . . .

The bill also expands the coverage of this Act to cover injuries occurring in the contiguous dock area related to longshore and ship repair work.

The bill also resolves the longstanding dispute over third-party actions by injured longshoremen by providing that such actions may be brought against vessels on the basis of negligence, but the remedy based on unseaworthiness is eliminated. In addition, indemnity actions against stevedoring companies are prohibited. Agreements between stevedoring companies and vessels to indemnify the latter are prohibited.

. . . . .

(The omitted paragraphs deal with upward revision of the benefit structure and with administrative changes.)

*Ship, Inc., supra*, 447 U.S. at 718–19, 100 S.Ct. at 2435–36.

As succinctly stated in *Ford, id.*:

The pre-1972 Act was simply an effort to fill the gap in workmen's compensation coverage created by this Court's decision in *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), which held that state compensation systems could not reach longshoremen injured seaward of the water's edge. A single situs requirement in § 3(a) of the Act governs the scope of its coverage. That requirement limited coverage to workers whose "disability or death result[ed] from an injury occurring upon the navigable waters of the United States (including any dry dock) . . . ." Longshoremen's and Harbor Workers' Compensation Act of 1927, ch. 509, § 3(a), 44 Stat. 1426. In light of *Jensen* and the limited purpose of the Act, the situs test was understood to draw a sharp line between injuries sustained over water and those suffered on land. Thus, in *Nacirema Operating Co. v. Johnson*, 396 U.S. 212, 218–220, 90 S.Ct. 347, 351–352, 24 L.Ed.2d 371 (1969), this Court held that the Act did not extend to injuries occurring on a pier attached to the land. Although the Court recognized that inequities might result from rigid adherence to the *Jensen* line, the Court concluded that "[t]he invitation to move that line landward must be addressed to Congress, not to this Court." *Id.*, [396 U.S.,] at 224, 90 S.Ct. at 354.

. Congress responded with the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972 (1972 Act).

The intermediate states of jurisprudential development of the coverage issue between *Jensen* and *Nacirema Operating Co. v. Johnson, supra*, are described in *Sun Ship*, 447 U.S. at 718, 100 S.Ct. at 2435.

[T]he Court began to narrow the *Jensen* doctrine by identifying circumstances in which the subject of litigation might be maritime yet "local in character," and thus amenable to relief under state law. *Western Fuel Co. v. Garcia*, 257 U.S. 233, 42 S.Ct. 89, 66 L.Ed. 210 (1921); *Grant Smith-Porter Ship Co. v. Rohde*, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922). And, in 1927, Congress was finally successful in extending a measure of protection to marine workers excluded by *Jensen* by enacting a federal compensation law—the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq . . . .

Federal and state law were thus linked together to provide theoretically complete coverage for maritime laborers. But the boundary at which state remedies gave way to federal remedies was far from obvious in individual cases. As a result, the injured ·worker was compelled to make a jurisdictional guess before filing a claim; the price of error was unnecessary expense and possible foreclosure from the proper forum by statute of limitations. *Davis v. Department of Labor*, 317 U.S. 249, 254, 63 S.Ct. 225, 228, 87 L.Ed. 246 (1942). After a decade and a half during which there had not been formulated "any guiding, definite rule to determine the extent of state power in advance of litigation," *id.*, at 253, 63 S.Ct., at 227, the Court determined that the border between federal and state compensation schemes was less a line than a "twilight zone," in which "employees must have their rights determined case by case . . . ," *id.*, at 256, 63 S.Ct., at 229. Within this zone, *Davis* effectively established a regime of concurrent jurisdiction.

*Calbeck v. Travelers Insurance Co.*, 370 U.S. 114, 82 S.Ct. 1196, 8 L.Ed.2d 368 (1962), further overlapped federal and state law coverage for marine workers. *Calbeck* held that the LHWCA comprehended "all injuries sustained by employees on navigable waters," *id.*, at 124, 82 S.Ct., at 1202, without regard to whether the locus of an event was "maritime but local," and hence within the scope of state compensations provisions.[18]

---

18. For more detailed discussions of the evolution of the LHWCA, see generally Gilmore &

Black, The Law of Admiralty, 404–23 (2d ed.

Thus, as summarized by *Sun Ship*, 447 U.S. at 719, 100 S.Ct. at 2436:

> Before 1972, then, marine-related injuries fell within one of three jurisdictional spheres as they moved landward. At the furthest extreme, *Jensen* commanded that nonlocal maritime injuries fall under the LHWCA. "Maritime but local" injuries "upon the navigable waters of the United States," 33 U.S.C. § 903(a), could be compensated under the LHWCA or under state law. And injuries suffered beyond navigable waters—albeit within the range of federal admiralty jurisdiction—were remediable only under state law. *Nacirema Co. v. Johnson, supra.*

That all employment-related injuries on navigable waters, including those that were characterized as "maritime but local," were considered to have been in maritime employment, can be seen not only from the decisions of the era, *see, e.g., Nalco Chemical Corporation v. Shea, supra,* 419 F.2d at 574,[19] but also by considering that under the pre-1972 scheme of coverage (see note 11), as now, the Act applied only to employers whose employees were "employed in maritime employment, in whole or in part upon the navigable waters of the United States." Section 2(4) of the Act, 33 U.S.C. § 902(4). And aside from its statutory meaning for purposes of the LHWCA, the term "maritime employment" includes even in a nontechnical, general sense, employment upon the navigable waters.[20]

Under the pre-1972 jurisprudence, thus, an injury in "maritime employment" included, for purposes of the Act, all work injuries of amphibious workers on navigable water. Given this accepted pre-1972 meaning of the term for purposes of the Act, then within the intention of the 1972 amendments an amphibious worker injured on the navigable waters simultaneously meets both the "situs" and the "status" (occupational) tests. As earlier noted, the legislative purpose of adding the "maritime employment" test was to limit the Act's coverage in the newly extended shoreside areas to those employees who were injured therein in the course of maritime-related employment. We can find no sign in the legislative history or purpose that the Congress intended by the 1972 amendments to change the prior well-accepted understanding that an injury on navigable waters was compensable as being in "maritime employment."

## IV. *Post-1972 Commentary and Jurisprudence*

Following adoption of the 1972 amendments, the new "maritime employment" status test has arisen for application in two situations. The bulk of the litigation concerns application of the test in the new extended shoreside application, as in *Caputo* (1977) and *Ford* (1979), which we have discussed at I above. A substantial minority of the decisions of the lower courts, however, attempted to apply a status test in some formulation to work-related injuries on navigable waters—*i.e.*, to those considered as in "maritime employment" prior to the 1972 revision—, although in all but three or four instances (only one from this circuit), coverage was nevertheless upheld.

---

1975); 1A Benedict on Admiralty §§ 1–11 (7th ed. 1981).

**19.** We conclude that Quave's activities were sufficiently maritime to fall within the scope of 33 U.S.C. § 902(4). It is noted that this section of the Act covers all employers whose employees are engaged in maritime employment "in whole or in part." This becomes significant here for Quave's activities were often over water and it was over water that the fatal accident took place. His regular duties consisted in large part of travelling directly to offshore drilling platforms which he could only reach by boat or seaplane.

419 F.2d at 574.

**20.** Persons engaged in maritime employment may be divided into two broad groups: members of the crew of a vessel in navigation who are generally referred to as seamen, and local waterfront workers doing a variety of ship to shore duties.

1A Benedict on Admiralty, *supra*, note 18, at p. 1–2.

On the basis that there can be nothing more maritime than the sea, every employment on the sea or other navigable water should be considered as maritime employment.

*Id.* at p. 2–5.

Preliminarily, we note that the majority view of the commentators, including the highly respected Gilmore and Black, is that the amended Act does not exclude coverage from anyone who would have been covered under the original Act; and thus that any injury upon the navigable waters is still compensable.[21] This view has also had the consistent support of the director of the Office of Workers' Compensation Programs, the administrative agency charged with enforcement of the LHWCA.[22] This court has held that the director's views are entitled to deference.[23] These authorities rely primarily on the legislative history and the remedial purposes of the 1972 amendments in support of the proposition that the amended Act does not exclude anyone who would have been covered prior to 1972.

In the adjudicative context, at least prior to 1979, it appeared that this position would be widely accepted. It was adopted by the Benefits Review Board ("BRB"), the entity created by the 1972 amendments to hear administrative appeals of LHWCA coverage disputes.[24] Furthermore, this "no exclusion of those traditionally covered" doctrine was initially embraced by the courts in *St. Julien v. Diamond M Drilling*, 403 F.Supp. 1256 (E.D.La.1975), and *Fusco v. Perini North River Associates*, 601 F.2d 659 (2d Cir. 1979), vacated, 444 U.S. 1028, 100 S.Ct. 697, 62 L.Ed.2d 664 (1980) ("*Fusco I*").

The first decision to take a more restrictive view of the LHWCA coverage of injuries on the actual water was *Weyerhaeuser Co. v. Gilmore*, 528 F.2d 957 (9th Cir. 1975), cert. denied, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976). *Weyerhaeuser* rejected the BRB's construction of the 1972 amendments as not affecting the pre-1972 construction of maritime employment that included all work-injuries on the water. Instead, the Ninth Circuit held that the term "maritime employment" means that the employment "must have a realistically significant relationship to 'traditional maritime activity involving navigation and commerce on navigable waters.'" 528 F.2d at 961 (a test it educed from *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972)—a decision we find inapposite for this purpose, for reasons to be stated in V below). Thus, under the *Weyerhaeuser* test, some employees whose injuries would have been covered under the pre-1972 Act would not be entitled to LHWCA coverage. The *Weyerhaeuser* court relegated *Calbeck* and the other pre-1972 decisions "to limbo," based on the conclusion that the 1972 amendments "radically changed the basis for an employee's entitlement to federal compensation." 528 F.2d at 960.

In recent years, the more restrictive *Weyerhaeuser* test has been accepted, or at least given lip service, by many courts, including

**21.** *See, e.g.,* Gilmore & Black, *supra cit.* n. 18, at 428–30; 1A Benedict on Admiralty, *supra* n. 18, at §§ 17, 19; Norris, The Law of Maritime Personal Injuries § 66, at 75 (3d ed. supp. 1982); Robertson, *Injuries to Marine Petroleum Workers: A Plea for Radical Simplification*, 55 Tex.L.Rev. 973, 986–87 (1977); Comment, *Broadened Coverage under the LHWCA*, 33 La.L.Rev. 683, 694 (1973); Note, 54 N.C.L.Rev. 925, 940 (1976). *Contra*, 4 Larson, The Law of Workmen's Compensation §§ 89.27, 89.41 (1982); Tucker, *Coverage and Procedure under the Longshoremen's and Harbor Workers' Compensation Act Subsequent to the 1972 Amendments*, 55 Tul.L.Rev. 1056, 1062 (1981).

**22.** The Director has filed *amicus* briefs to this effect in a number of cases, including this one, and he once proposed published guidelines that would accord with this conclusion. *See* 39 Fed.Reg. 18268 (May 23, 1974).

**23.** *See Miller v. Central Dispatch, Inc.*, 673 F.2d 773 (5th Cir. 1982); *Alford v. American Bridge Division, U. S. Steel Corp.*, 642 F.2d 807, 809 (5th Cir. 1981). The panel dissent inadvertently asserted, 664 F.2d at 473 n. 10, that we must give deference to the view of the Benefits Review Board. Rather, as indicated in *Miller* and *Alford*, deference is owed to the Director, not to the BRB.

**24.** *See, e.g., Stewart v. Brown & Root, Inc.*, 7 Benefits Review Board Service ["BRBS"] 356, 361 (1978), aff'd on other grounds sub nom. *Brown & Root, Inc. v. Joyner*, 607 F.2d 1087 (4th Cir. 1979), cert. denied, 446 U.S. 981, 100 S.Ct. 2960, 64 L.Ed.2d 837 (1980); *Gilmore v. Weyerhaeuser Co.*, 1 BRBS 180, 182–83 (1974), rev'd 528 F.2d 957 (9th Cir. 1975), cert. denied, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976).

this court. Ironically, the case that proved to be the catalyst for the widespread acceptance of the restrictive *Weyerhaeuser* view regarding accidents upon the actual water was the Supreme Court's decision in *Ford, supra,* a case that actually *expanded* LHWCA shore-side coverage.

Subsequent to *Ford,* over the dissent of three justices, the Supreme Court vacated and remanded the Second Circuit's *Fusco I* decision for reconsideration in light of *Ford. Perini North River Associates v. Fusco,* 444 U.S. 1028, 100 S.Ct. 697, 62 L.Ed.2d 664 (1980). On remand, despite the fact that *Ford* took a very expansive view of LHWCA coverage, and despite the fact that *Ford* did not so much as mention the *Weyerhaeuser* "significant relationship to navigation or commerce on navigable waters" test for determining "maritime employment," the Second Circuit found that *Ford* had "rendered untenable" its holding in *Fusco I.* Noting *Ford's* conclusion that the term "maritime employment" is an occupational concept, based on the nature of a worker's activities, the Second Circuit read *Ford* "as precluding any application of the LHWCA as amended in 1972, to an employee whose activities do not bear a significant relationship to navigation or to commerce on navigable waters." *Fusco v. Perini North River Associates,* 622 F.2d 1111, 1112–13 (2d Cir. 1980), *cert. denied,*[25] 449 U.S. 1131, 101 S.Ct. 953, 67 L.Ed.2d 119

(1981) (*"Fusco II"*). The *Fusco II* court noted that such a reading was consistent with the construction of the term "maritime employment" given by the *Weyerhaeuser* court, and with the position of the BRB, which, after having been reversed by the Ninth Circuit in *Weyerhaeuser,* had overruled its previous decisions that had held that the 1972 amendments did not in any way reduce the traditional coverage of the LHWCA.

Since 1979, the *Weyerhaeuser—Fusco II* "realistically significant relationship to traditional maritime activity" test for determining whether an individual was engaged in "maritime employment" has frequently been employed by the courts, in cases involving accidents both on the seaward and shoreward sides of the *Jensen* line. In this circuit, the *Weyerhaeuser* test has been cited approvingly in several decisions of the court, in cases involving accidents both on the land and the water;[26] nevertheless, LHWCA coverage was found in all of the cases.[27] As might be expected from application of a test that requires determination case-by-case under the specialized facts of each instance, the *Weyerhaeuser* test—even though recovery has ultimately been upheld—has produced sharp disagreement as to whether under particular facts the on-water employment indeed had the talismanic "significant relationship."[28]

---

**25.** In *Fusco II,* there appears to have been doubt whether the claimant would have been covered under the pre-1972 version of the Act. In that case, the government opposed the petitions for certiorari because the record failed to establish definitively "that [t]he claimants would have been covered under the pre-1972 Act." *Fusco II, supra,* Brief for Federal Respondent in Opposition, Nos. 80–639 and 80–651, at 18.

**26.** *See, e.g., Miller v. Central Dispatch, Inc., supra,* 673 F.2d at 781 (water); *Boudreaux v. American Workover, Inc., supra,* 664 F.2d at 465–66 (water); *Pippen v. Shell Oil Co., supra,* 661 F.2d at 382 (water); *Gilliam v. Wiley N. Jackson Co.,* 659 F.2d 54, 56–57 (5th Cir. 1981) (water); *Hullinghorst Industries, Inc. v. Carroll,* 650 F.2d 750, 756 (5th Cir. 1981) (pier), *cert. denied,* —— U.S. ——, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982); *Mississippi Coast Marine v. Bosarge,* 637 F.2d 994, 998 (5th Cir.) (land),

modified, 657 F.2d 665 (5th Cir. 1981); *Trotti & Thompson v. Crawford,* 631 F.2d 1214, 1221 (5th Cir. 1980) (land); *Odom Construction Co. v. United States Dep't of Labor,* 622 F.2d 110, 113 (5th Cir. 1980) (land), *cert. denied,* 450 U.S. 966, 101 S.Ct. 1482, 67 L.Ed.2d 614 (1981).

**27.** *Thibodaux v. Atlantic Richfield Co.,* 580 F.2d 841 (5th Cir. 1978), *cert. denied,* 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979), the only Fifth Circuit case in which an employee injured on water was deemed not to be covered by the amended LHWCA, did not discuss the *Weyerhaeuser* "significant relationship to traditional maritime activities" test. *See* note 29 below.

**28.** *See, e.g., Miller v. Central Dispatch, Inc.,* 673 F.2d 773, 784 (5th Cir. 1982) (BRB holds that a guard/driver injured on a vessel was not engaged in employment with a realistically significant relationship to maritime activities—the

It is of some significance to note that, despite the sometimes cumbersome methodology involved in the disputable borderline case-by-case application of the *Weyerhaeuser* "significant relationship" test, actually in only three decisions was coverage denied by it to a workman injured waterward of the *Jensen* line who would apparently have been covered by the pre-1972 Act under *Calbeck*: *Weyerhaeuser* itself, by the Ninth Circuit; *Fusco II* (but see note 25) by the Second; and, adhering to *Fusco II, Churchill v. Perini North River Associates*, 652 F.2d 255 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 1425, 71 L.Ed.2d 647 (1982). (Also, although not employing the *Weyerhaeuser* rationale, one decision of this court denied coverage for an on-water accident of an oil field worker, who presumably would have been covered under *Calbeck*, on a basis subsequently disapproved by *Ford* and subsequent decisions of this circuit. *Thibodaux v. Atlantic Richfield Co.*, 580 F.2d 841 (5th Cir. 1978).[29]

## V. Distinction Between Shoreside and On-Water Injuries Insofar as Being in "Maritime Employment"

We have found no legislative intent to alter the previously accepted construction of the Act as considering employment on the navigable waters to be "maritime employment." See II and III above. For employees injured in the course of such employment, no further examination into the relationship of their employment activities to " 'traditional maritime activity involving navigation and commerce on navigable waters,' " *Weyerhaeuser supra*, 528 F.2d at 961, is necessary, because by settled construction of the Act their duties necessarily constitute such maritime activity.

However, as we noted, *see* text *supra* at note 11, the 1972 expansion of situs to include shoreside areas required a different change both in the definition of "employer" to include those within the expanded situs and also in the definition of "employee" so as to exclude those employees injured in the expanded shoreside situs who were not engaged in maritime-related employment. As the legislative committee reports stated, the 1972 revision to include shoreside areas was not intended to cover employees "just because they are injured in an area adjoining navigable waters" or who were *not* "engaged, in whole or in part in some form of maritime employment." S.Rep. at 13; H.Rep. at 4708.

court reverses, expressing amazement "how the BRB could fail to find Ms. Miller's employment as maritime"); *Prolerized New England Co. v. Benefits Review Board*, 637 F.2d 30, 34 (1st Cir. 1980) *cert. denied*, 452 U.S. 938, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981) (ALJ finds that claimant's relation to waterborne transportation at the time of his injury was too remote for LHWCA coverage—the court affirms the BRB's reversal of the ALJ's decision, noting that on the administrative remand after BRB reversal the ALJ entered an order in accordance with the Board's order "while protesting vehemently that his earlier ruling was correct," 637 F.2d at 34). *See also* the dissent from the panel opinion in the present case, 664 F.2d at 469, 479 (dissent characterizes majority's conclusion that the claimant's employment was "significantly related" to maritime activities as a "sweeping declaration" without "any basis whatever of prior authority").

**29.** In *Thibodaux*, the oil field worker was regularly transported by water (a canal) to his worksites. The court held that the worker was not engaged in "maritime employment" under the Act because he did not spend part of his time " 'indisputably' as a longshoreman, harbor worker, ship repairman, shipbuilder, or shipbreaker," nor was he "actually involved in the loading, unloading, repairing, shipbuilding, shipbreaking process, or an integral part thereof, at the time he unfortunately met his death." 580 F.2d at 845.

Pretermitting whether such a test was ever applicable to an amphibious worker injured on the water, we noted in *Miller v. Central Dispatch*, 673 F.2d 773, 780 (5th Cir. 1982) (emphasis added):

Under the status test, the essential requirement is that the claimant must be "engaged in maritime employment." Although "maritime employment" is not specifically defined in the Act, the Supreme Court has indicated that this requirement is occupational rather than geographical. *P. C. Pfeiffer Co. v. Ford*, 444 U.S. at 78–81, 100 S.Ct. at 335–36, 62 L.Ed.2d at 233–35. While § 902(3) specifically grants coverage to longshoremen, harbor workers, shipbuilders, etc., *the Act encompasses occupations beyond those specifically listed. P. C. Pfeiffer Co. v. Ford*, 444 U.S. at 77 n.7, 100 S.Ct. at 334 n.7, 62 L.Ed.2d at 233 n.7.... (Emphasis supplied.)

To delineate only those shoreside employees who were legislatively intended to be included within the coverage of the Act, the *Weyerhaeuser* or an equivalent maritime-relationship test may indeed be appropriate.[30]

Where we part company with *Weyerhaeuser* is in its application of such a test to those injured while working on navigable waters, construed for LHWCA purposes as being in maritime employment since *Calbeck*. As earlier noted, to restrict this accepted statutory construction is to do so in the complete absence of any intent expressed in the legislative history to do so and, in fact, in the face of express statement by the legislative drafters that the new 1972 definition of employee afforded by the amended section 2(3) "does not exclude other employees traditionally covered." S.Rep. at 16. See II above.

*Weyerhaeuser* derived its "significant relationship" test for coverage, 528 F.2d at 961, by direct quotation from *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). That decision is inapposite to the issue now before us. The sole issue in *Executive Jet* was whether there was federal jurisdiction over a suit for damages resulting from an airplane crash into navigable waters, and there the assertion of jurisdiction was based solely upon the provision of 28 U.S.C. § 1333(1) granting federal district courts jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction." The Court emphasized that in flights between points in the continental United States, "which are principally over land, the fact that an aircraft happens to fall in navigable waters, rather than on land, is wholly fortuitous." 409 U.S. at 266, 93 S.Ct. at 503. The Court held that

> the mere fact that the alleged wrong "occurs" or "is located on" or over navigable waters ... is not of itself sufficient to turn an airplane negligence case into a "maritime tort." It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.

409 U.S. at 2681, 93 S.Ct. at 504.

*Executive Jet* is thus entirely inapposite to the issues before us. Although the issue there and here each involved a determination of legislative intent in the utilization of the term "maritime," two entirely different

---

**30.** Thus, in *Hullinghorst Industries, Inc. v. Carroll*, 650 F.2d 750 (5th Cir. 1981), we summarized some of the jurisprudential criteria that have evolved in the determination of whether workers—when injured in the shoreside areas newly covered by the 1972 amendment—were engaged in "maritime employment" within the legislative intent. In upholding coverage, we there stated, 630 F.2d at 756:

> Carroll's work in erecting the scaffolding was an integral part of an indisputably maritime pier repair project, an essential and indispensable step in the repairs to be effected. It was not merely "incidental" to that project, *see Dravo Corp. v. Banks*, 567 F.2d 593, 595–96 (3rd Cir. 1977) (unskilled laborer spreading salt on ice at shipyard not engaged in maritime employment), nor was it the type of job "peripherally related to maritime matters that Congress said was not to be covered by the LHWCA, such as trans-shipment of stored cargo or clerical work," *see Odom Construction Co. v. United States Dep't of Labor, supra* [622 F.2d 110 (5th Cir. 1980)], 622 F.2d at 113. It was an integral step in a maritime project of the type that could be performed by a typical harborworker. *See id.* at 112. It directly furthered the maritime goals of the Wyandotte port facility—the loading and unloading of ships. *See Trotti & Thompson v. Crawford, supra* [631 F.2d 1214 (5th Cir. 1980)], 631 F.2d at 1220. It clearly bore a "realistically significant relationship to 'traditional maritime activity involving navigation and commerce on navigable waters'...." *Odom Construction Co. v. United States Dep't of Labor, supra*, 622 F.2d at 113. That the skills utilized by Carroll were "essentially nonmaritime" in character is immaterial. It is the purpose of the work that is the key; "nonmaritime" skills applied to a maritime project *are* maritime for purposes of the "maritime employment" test of the Act. *Mississippi Coast Marine v. Bosarge*, 637 F.2d 994, 997–98 & n.7 (5th Cir. 1981); *Trotti & Thompson v. Crawford, supra*, 631 F.2d at 1221 nn. 15, 16. *See Odom Construction Co. v. United States Dep't of Labor, supra*, 622 F.2d at 112–13.

statutes are concerned, each with different legislative histories and jurisprudential interpretations over the course of decades.[31] Unlike *Executive Jet*, which involved no specific legislation addressed to the issue, here the LHWCA both in its 1927 enactment and its 1972 revision provided for coverage of injuries in "maritime employment" occurring "upon the navigable waters of the United States," which the Court in *Calbeck* had interpreted to include all injuries in the course of employment upon the navigable waters. Finally, marine petroleum workers are not "fortuitously" located on the water, but are required to work there by the nature of their jobs, a substantial maritime relationship.

### VI. *No Intention to Reduce Prior Coverage of On-Water Injuries: The Contribution of* Sun Ship

The rationale in *Sun Ship, Inc. v. Pennsylvania, supra*, supports our conclusion that the legislative history of the 1972 amendments reflects no intention to disturb the prior *Calbeck* interpretation of the Act that work-injuries on navigable waters were incurred in maritime employment for purposes of the LHWCA.

The issue in *Sun Ship* was whether the shoreside extension of the Act's federal compensation coverage displaced *state* workers' compensation laws applicable to those on-land injuries, a concurrent *state* compensation remedy available under pre-1972 LHWCA interpretations to workingmen injured in "maritime but local" activities. The issue is the obverse of the present, which is: did the 1972 revisions reflect any intent to remove a *federal* compensation remedy formerly available to those amphibious workmen injured while working on navigable waters? Nevertheless, the issue is generically similar; as *Sun Ship* recounted, 447 U.S. 718–19, 100 S.Ct.

at 2435–36 (quoted in III above), both the concurrent state-federal remedy for "maritime but local" workers, as well as the *Calbeck* holding that the LHWCA comprehended "all injuries sustained by employees on navigable waters," 370 U.S. at 124, 82 S.Ct. at 1202, resulted after years of tortuous litigation attempting to solve the same problem:

Under the "maritime but local" doctrine, a state, instead of a federal, remedy was accorded a workman injured on navigable waters, if neither his general employment nor his activities at the time of the accident "had any direct relationship to navigation or commerce." *Grant Smith-Porter Co. v. Rohde*, 257 U.S. 469, 475–76, 42 S.Ct. 157, 158, 66 L.Ed. 321 (1922). However, the state remedy would be disallowed—and the federal remedy was exclusive—if the Court found that the employment was "not [a] matter of purely local concern," but instead had "direct relation to commerce and navigation." *Northern Coal & Dock Co. v. Strand*, 278 U.S. 142, 144, 49 S.Ct. 88, 89, 73 L.Ed. 232 (1928). *Sun Ship* describes the uncertainties, hardships, and requirement for litigation by "jurisdictional guess," 447 U.S. at 718, 100 S.Ct. at 2435, that resulted from the necessity on a case by case basis to determine whether an amphibious worker's employment had sufficient "direct relation to commerce and navigation" so as to be compensable under the federal or the state remedies respectively. To solve this identical problem, concurrent state and federal remedies were recognized for "maritime but local" land-based employees (*Davis, supra*, discussed in III), while *Calbeck* held that all work-injuries on the navigable waters were compensable under the LHWCA "without regard to whether the locus of an event was 'maritime but local,' and hence within the scope of state compensation provisions." *Sun Ship*, 447 U.S. at 718, 100 S.Ct. at 2435.

---

**31.** Our decision in *Sohyde Drill & Marine v. Coastal States Gas Production*, 644 F.2d 1132 (5th Cir. 1981) may be likewise distinguished as inapposite as concerning solely the legislative intent of the Admiralty Jurisdiction Act, 46 U.S.C. § 740. That statute recognized federal admiralty and maritime jurisdiction over cases of injury caused by a vessel on navigable water, notwithstanding that the injury was done or consummated on land. Following *Executive Jet*'s rationale, and *considering the legislative purposes of the statute at issue*, we determined that the well blow-out in *Sohyde* did not possess sufficient maritime relationship to permit exercise of the federal admiralty jurisdiction under the cited statute.

*Sun Ship* examined the legislative history and reports of the same 1972 amendments as are at issue before us. 447 U.S. at 719–725, 100 S.Ct. at 2436–39. Citing the complete absence of any reflected intent to abrogate the doctrines of *Davis* and *Calbeck*, the Court held that the 1972 amendments could not fairly be understood as "resurrecting the jurisdictional monstrosity that existed before the clarifying opinions in *Davis* and *Calbeck*," 447 U.S. at 719, 100 S.Ct. at 2436. The Court also noted that so to adopt the appellant's position "would thrust employees into the same jurisdictional peril from which they were rescued by *Davis* and *Calbeck v. Travelers Insurance Co.*," 447 U.S. at 725, 100 S.Ct. at 2439—a result that "would blunt the thrust of the 1972 amendments, and frustrate Congress' intent to aid injured maritime workers" through this "remedial" legislation enacted "out of solicitude for the workers." *Id.*

The issue in *Sun Ship* related to whether the pre-1972 concurrent state-federal remedy recognized by *Davis* had been diminished by the 1972 amendments. Nevertheless, *Sun Ship*'s reasoning, it seems to us, equally applies as to the generically similar issue before us, *i.e.*, whether these same amendments have diminished *Calbeck*'s pre-1972 recognition of all work-injuries on navigable waters as being in "maritime employment" for purposes of the Act—an interpretation complementary to the concurrent-remedy interpretation of the Act accorded by *Davis*, equally based upon the identical reasons of effectuating the certain and efficient administration of the compensation remedy afforded by Congress to amphibious workers by the Act.[32]

We, similarly to *Sun Ship*, can find no legislative intent expressed in the legislative history to override *Calbeck*'s interpretation that injuries sustained at work on navigable waters were sustained in "maritime employment" within the meaning of the Act; in fact, the legislative history here indicates the contrary. See II above. We note that attempting to determine case by case whether an on-water injury occurs in an employment with a "realistically significant relationship to traditional maritime activity involving navigation and commerce on navigable waters," as enunciated by *Weyerhaeuser, supra*, involves the same difficulties and disagreements in determinations (*see, e.g.*, note 28), as did the unworkable case by case determination in the "maritime but local" test of whether the employment had a "direct relationship to navigation or commerce," *see Grant Smith-Porter v. Rohde, supra*, that was rejected by *Davis* and *Calbeck*. No more than was the Court in *Sun Ship*, are we willing to believe that in its 1972 remedial revisions the Congress intended—without the slightest sign of any intent to do so—to resurrect the "jurisdictional monstrosity" created by such a test of indeterminate content, terminated fully by the clarifying interpretations of *Davis* (1942) and *Calbeck* (1962).

One final note. We must be mindful that a primary intent of the 1972 amendments was not only remedial as to injured work-

---

**32.** It is only fair to state that the Second Circuit in its per curiam opinion in *Churchill v. Perini North River Associates*, 652 F.2d 255 (2d Cir. 1981), *cert. granted*, —— U.S. ——, 102 S.Ct. 1425, 71 L.Ed.2d 647 (1982), in refusing to recede from *Fusco II*, reached a contrary conclusion:

> While the question is certainly not free from doubt, we decline to read *Sun Ship, Inc.*'s reaffirmation of *Davis* and *Calbeck* as creating such a dramatic change in the analytical framework set forth in *Ford* less than a year earlier. Indeed, Justice Brennan, writing for the Court in *Sun Ship, Inc.*, stated that "[t]he line that circumscribes the jurisdiction of the LHWCA" is a "compound of 'status' and 'situs'." 447 U.S. at 725, 100 S.Ct. 2439, 65 L.Ed.2d 458. *Sun Ship, Inc.*, held only that nothing in the 1972 Amendments precludes a state from offering compensation to an employee who is admittedly covered under the expanded situs of the Act. The distinct question of *which* employees are covered under the Act is controlled by the analysis set forth in *P. C. Pfeiffer Co. v. Ford, supra*, and applied by this Court in *Fusco II*. See also *Weyerhaeuser Co. v. Gilmore*, 528 F.2d 957 (9th Cir. 1975), *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976). We do not read *Sun Ship, Inc.* as suggesting that the *Ford* analysis should not apply to injuries occurring on the water itself. We therefore adhere to our reasoning in *Fusco II*. 652 F.2d at 258.

ers, by increasing their benefits and by extending coverage landward. Another principal purpose was to free maritime employers of indemnity claims by vessels on which their employees were injured, and thus to assure that an employer's compensation liability under the Act "shall be exclusive and in place of all other liability" for an employment-related injury, section 905(a), 33 U.S.C. § 905(a). See text at notes 9 and 10 above. The express legislative intent was to immunize employers of amphibious workers injured on a vessel from indemnity claims, such as that herein asserted by the vessel-defendant by third-party demand against the plaintiff Boudreaux's employer.

If we here determine that Boudreaux was not in "maritime employment" at the time of his injury on navigable waters, his employer is exposed to the vessel's indemnity action, see Miller v. Central Dispatch, Inc., supra, 673 F.2d at 784, despite the undoubted and express intent reflected by the legislative reports and statutory language to exempt all maritime employers from such a claim. The legislative history reveals not the slightest intention other than that this freedom from indemnity claim granted by the 1972 amendments was intended to benefit all employers of amphibious workers injured on vessels, such as Boudreaux's employer in the present instance. To withdraw coverage from Boudreaux and other amphibious workers injured on navigable waters is to expand their employers' exposure to such indemnity claims, as well as to vexatious suits on a case-by-case basis (including those based on unseaworthiness), using indefinite criteria to determine whether the employee's injuries were or were not covered by the Act. As we stated in this context in Miller, supra,

> This result would run contrary to the clear Congressional intent under the 1972 amendments to include maritime workers under the Act in exchange for eliminating the right to sue for unseaworthiness. Sun Ship, Inc. v. Pennsylvania, 447 U.S. at 724, 100 S.Ct. at 2438, 65 L.Ed.2d at 466. The LHWCA is to be liberally con-

strued and in such a way as to avoid the jurisdictional dilemma which existed prior to the 1972 amendments. See Sun Ship, Inc. v. Pennsylvania, 447 U.S. at 719–21, 725–26, 100 S.Ct. at 2436–37, 2439, 65 L.Ed.2d at 462–64, 466–67.

673 F.2d at 784.

## VII. Coverage Afforded Even Under the Weyerhaeuser Test

We further note that coverage of the Act is here afforded even under the Weyerhaeuser test—i.e., that, even though the injury is sustained on the navigable waters, for an injured employee's work-activity to be considered within the coverage of the Act as "maritime employment," the employment activities must have a realistically significant relationship to traditional maritime activity relating to navigation or commerce on navigable waters. This is the conclusion reached by the panel decision herein, 664 F.2d at 464–66 (Part I), relying upon a holding under similar facts in Pippen v. Shell Oil Co., 661 F.2d 378 (5th Cir. 1981). In both of these decisions, oil-production specialty workers were injured at work on movable drilling barges ("vessels"). The situs test was unquestionably met, and the issue was whether these employees met the status or "maritime employment" test.

The substance of the reasoning in these decisions is set forth at Pippen, 661 F.2d at 383–84:

> In the instant case, plaintiff Pippen was a wireline operator. At the time of his injury he was preparing to set packers for perforation. The function of the vessel on which Pippen was working was to drill gas wells; consequently, Pippen's work was essential to the function of the vessel. More importantly, Pippen's job was necessary to the completion of the offshore drilling process. As discussed above, to determine whether the status test is satisfied, it is necessary to examine the nature and purpose of the employee's activities and to determine whether those activities had a realistically significant relationship to maritime navigation or commerce. The "significant relationship"

requirement can be met when the purpose of the employee's activities is to facilitate maritime commerce. Since offshore drilling—the discovery, recovery, and sale of oil and natural gas from the sea bottom—is maritime commerce, it follows that the purpose of Pippen's work was to facilitate maritime commerce. Since the purpose of Pippen's work was to enable the vessel to perform its designated task—offshore drilling—and since the work was, in addition, directed at facilitating maritime commerce, we are compelled to conclude that the work performed by Pippen had a realistically significant relationship to maritime commerce. Thus, Pippen was engaged in maritime employment at the time of his injury.

Or, as summarized by the panel majority in *Boudreaux*, 664 F.2d at 466:

> The ruling in *Pippen* is dispositive of the present issue. In the case before us, Boudreaux (like Pippen) was injured on navigable waters while performing wire-lining employment duties that were an integral or essential contribution to the mineral-production function of the vessel upon which he was working. The work performed thus "has a realistically significant connection to traditional maritime activity", *Pippen, supra*, 661 F.2d at 385, so as to be "maritime employment" within the coverage of the LHWCA.

The jurisprudential expressions upon which these conclusions are reached are fully set forth by the cited opinions. We see no need to reiterate them here. Suffice it to say, they fully support the holdings in these cases that the injured employees involved met the "significant relationship" test of maritime employment enunciated by these decisions, and that therefore their injuries were within the coverage of the Act.

Some suggestion is made that contemporaneous 1972 legislative action (or rather inaction) indicates that Congress did not consider maritime oil-production workers to be covered by the Act, as amended in 1972. Reliance is placed upon Congress's failure, after consideration, to enact the "Tower bill", the "Marine Petroleum Workers' Compensation Act of 1971".[33] However, assuming legislative intent could be deduced from Congress's failure to enact related legislation, no such inference could be drawn here. The Tower bill was intended to extend LHWCA coverage to *all* marine petroleum extractive workers; its primary purpose, however, was to relegate to the LHWCA compensation remedy those oil workers assigned as "members of the crew" to movable barges and thus entitled to the greater damages afforded by the Jones Act, *see Offshore Company v. Robison*, 266 F.2d 769 (5th Cir. 1959).[34] As the Senate committee hearings show, it was conceded by both industry and labor witnesses that non-crew offshore oil workers were then entitled to LHWCA benefits if injured on navigable waters, or on fixed platforms on the outer continental shelf, and the effort of the bill was only to extend a similar coverage to oil-worker "crew" members on movable barges and to deny them the more generous Jones Act seaman remedy.[35] If any inference as to Congressional intent is permissible from the circumstances surrounding non-enactment of the Tower bill, it is that Congress felt that no new legislation was required to afford LHWCA coverage to non-crew oil-workers injured on navigable waters, and that it did not wish to deprive "crew" oil-workers of their more lucrative Jones Act recovery.

---

**33.** *See* proposed "Marine Petroleum Workers' Compensation Act" S. 1547, 92d Cong., *reprinted in* Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972: Hearings Before the Subcommittee on Labor, Senate Committee on Labor and Public Welfare, on S. 2318, S. 525, and S. 1547, 92d Cong., 2d Sess., at 24–27 (1972) (hereinafter cited as "Senate Hearings").

**34.** Introductory Statement of Senator John Tower on S. 1547, Marine Petroleum Workers' Compensation Act of 1971, 117 Cong.Rec. 10,490–91 (1971).

**35.** *See, e.g.*, Senate Hearings, *supra* note 33, at 396, 402, 411, 451–53, 473–76. *See also id.* at 487, 581–90, 602–13 (considered *all* oil-production workers on the water as in "maritime employment."

*Conclusion*

For the reasons above stated, we conclude that the 1972 LHWCA amendments did not in any way diminish the traditional coverage of workers injured at work on navigable waters, who under the Act have been and are considered to be in "maritime employment." Even were it required that the duties of a "maritime employee" require a "significant relationship to maritime commerce or navigation", the plaintiff Boudreaux is nevertheless within the coverage of the LHWCA, because persons in the marine petroleum business who work on drilling vessels in navigable waters are engaged in employment significantly related to maritime navigation and commerce. Accordingly, we AFFIRM the judgment of the district court, which held that the third-party defendant (Boudreaux's employer) was exempted from indemnifying the vessel party (defendant in Boudreaux's suit, and third-party plaintiffs herein) by statutory provisions according this defense to employers covered by the Act.

AFFIRMED.

GEE, Circuit Judge, with whom GARWOOD, Circuit Judge, joins, dissenting:

At the time of the panel decision in this appeal, December 7, 1981, I prepared and filed a dissent stating at some length why I thought the views expressed in the panel opinion were incorrect. *Boudreaux v. American Workover, Inc.*, 664 F.2d 463, 469–80 (5th Cir. 1981). Judge Tate's opinion for the en banc court is sufficiently similar to his for the panel that I see small occasion to repeat here what I said there. Since then, moreover, on February 22, 1982, the Supreme Court granted certiorari in *Churchill v. Perini North River Associates*, 652 F.2d 255 (2d Cir. 1981), *cert. granted sub nom. Director, Office of Workers' Compensation Programs v. Perini North River Associates*, —— U.S. ——, 102 S.Ct.

1425, 71 L.Ed.2d 647 (1982). The issue there is the same as here, and since it is now to be decided by the high Court, I see little need for us to debate it further.

Simply stated, it is whether there are to be different "status" requirements for LHWCA coverage according to the "situs" of the injury. As all acknowledge and none disputes, the Supreme Court held, in *P. C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979), that after the 1972 revision of the LHWCA a dual test governs coverage: situs (injury on navigable waters or their recently included adjoining areas) *and* status (work in maritime employment). According to the majority opinion above, whenever a worker is injured on navigable waters themselves, both the status and the situs requirements of *Pfeiffer* are ipso facto satisfied. This is to say that any work whatever, no matter how landside in nature, becomes "maritime employment" if performed at a location actually *on* such waters and that the status test of *Pfeiffer* is therefore to be applied to exclude coverage as nonmaritime only on the newly included adjoining areas—piers, wharfs, and so on. Thus by semantic legerdemain the dual test of *Pfeiffer* is effectively cabined in application to the narrow fringe of "adjoining areas" added by the 1972 amendments.

So to hold, in my view, is largely to reverse the principles laid down in *Pfeiffer* by the Supreme Court—a bold stroke indeed. In so holding, we stand alone among the major maritime circuits. But for us, each of these, to one degree of clarity or another, has held that "status" requires for coverage that the work being done at the time of injury be of a nature traditionally maritime and bear some significant relationship to navigation and commerce on navigable waters.[1]

---

1. First Circuit: *Graziano v. General Dynamics*, 663 F.2d 340 (1981); Second Circuit: *Churchill v. Perini North River Associates, supra*; Third Circuit: *Dravo v. Banks*, 567 F.2d 593 (1977); Fourth Circuit: *Caldwell v. Ogden*, 618 F.2d 1037 (1980); Ninth Circuit: *Weyerhaeuser v.*

*Gilmore*, 528 F.2d 957, *cert. denied*, 429 U.S. 868, 97 S.Ct. 179, 50 L.Ed.2d 148 (1976). The Eleventh will be governed, as I understand it, by our "Old Fifth Circuit" decision today unless it affirmatively acts to the contrary.

To me, therefore, the weight of authority—as represented by the opinions of our sister circuits—and the dictates of reason—as I have sought to show in the panel dissent cited above—are to the contrary of the majority's decision today. I therefore respectfully dissent from it, pretermitting further discussion since the matter will shortly be settled by the Court.

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John BUTLER and Judy Butler, Defendants-Appellants.**

No. 81–2320

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

July 9, 1982.

Rehearing Denied Aug. 25, 1982.

Michael P. Carnes, Dallas, Tex., for defendants-appellants.

Christian Harrison, Asst. U. S. Atty., Tyler, Tex., for plaintiff-appellee.

Before RUBIN, JOHNSON and GARWOOD, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

A husband and wife were convicted of conspiring to manufacture and of manufacturing P2P, a controlled substance. The husband was also convicted on two counts of using a telephone in furtherance of the conspiracy. They assert that evidence was improperly admitted at their trial and that suppressed evidence was improperly considered at their sentencing. Finding that neither contention has merit, we affirm.

Our resolution of many of the points raised by the husband and wife, John and Judy Butler, is of no precedential value and is of interest only to the parties. It has been issued to them in manuscript form. Our discussion of one point they raise is of precedential value and it is set forth below.

The Butlers contend that the trial judge erred in considering at sentencing the fruits of an unconstitutional search made at a farmhouse at which they were manufacturing a controlled substance. A motion to suppress was granted because the affidavit

made to obtain the search warrant did not show probable cause. Although it is doubtful that any of the suppressed evidence as revealed in the presentence reports differed substantially from testimony admitted at trial, the district judge explicitly stated that he thought the exclusionary rule inapplicable and that he would consider the suppressed evidence.

The Butlers rely on *Verdugo v. United States*, 402 F.2d 599, 610–13 (9th Cir. 1968), *cert. denied*, 397 U.S. 925, 90 S.Ct. 931, 25 L.Ed.2d 105 (1969), in which the Ninth Circuit held it improper for the trial judge to consider such evidence. The *Verdugo* court did not, however, lay down a blanket rule for such situations; rather, it required a case-by-case weighing of the potential deterrent effect on police misconduct. In *Verdugo* the search was blatantly unconstitutional and one count of the two-count indictment was dismissed once the motion to suppress was granted. The court distinguished an earlier case in which resentencing was not required because there was admissible evidence, independently adduced, on the same facts. The court also noted that any deterrent effect from use of the exclusionary rule at sentencing would be minimal if a conviction were obtained without the evidence suppressed. The Ninth Circuit later held that a trial judge did not abuse his discretion in considering at sentencing evidence suppressed due to a technical flaw in a search warrant's underlying affidavit. *United States v. Larios*, 640 F.2d 938, 941–42 (9th Cir. 1981).

■ We have permitted broad inquiry at sentencing into a defendant's background, *United States v. Barnett*, 587 F.2d 252, 259 (5th Cir.), *cert. denied*, 441 U.S. 923, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979). The sentencing judge may consider evidence inadmissible at trial, *United States v. Gonzalez*, 661 F.2d 488, 495 (5th Cir. 1981), and prior convictions overturned on appeal, *United States v. Ochoa*, 659 F.2d 547, 549 (5th Cir. 1981). In *Ochoa*, we noted that a sentencing judge may not consider prior convictions obtained without counsel or where assumptions of an uncounselled de-

fendant's criminal record were materially untrue. *Id.* The potential for factual inaccuracy in these situations is not present, however, where a fourth amendment violation is concerned. Additionally, as the *Larios* court noted, courts have been hesitant to extend the exclusionary rule to situations where the deterrent value is less than that in the actual trial of a case. *See, e.g., United States v. Calandra*, 414 U.S. 338, 348–52, 94 S.Ct. 613, 620–22, 38 L.Ed.2d 561, 571–73 (1974) (refusing to apply exclusionary rule to evidence presented in grand jury proceeding); *United States v. Houltin*, 566 F.2d 1027, 1032–33 (5th Cir.), (expressing doubt whether exclusionary rule should be applied to testimony of coconspirators under grants of immunity where police learned of their knowledge from illegal wiretaps), *cert. denied*, 439 U.S. 826, 99 S.Ct. 97, 58 L.Ed.2d 118 (1978). Therefore, the district court did not err under these circumstances in considering the suppressed evidence for sentencing purposes.

For these reasons, the judgments are AFFIRMED.

**HOME LIFE INSURANCE COMPANY, NEW YORK, Plaintiff-Appellee Cross-Appellant,**

v.

**EQUITABLE EQUIPMENT COMPANY, INC., Defendant-Appellant Cross-Appellee.**

No. 80–3874.

United States Court of Appeals, Fifth Circuit.

July 19, 1982.

Rehearing Denied Aug. 25, 1982.

Brian, Simon, Peragine, Smith & Redfearn, A. Morgan Brian, Jr., New Orleans, La., for defendant-appellant cross-appellee.

Herman & Herman, Russ M. Herman, Shelley C. Herman, New Orleans, La., Thomas F. Coughlin, New York City, for plaintiff-appellee cross-appellant.

Before GEE, RUBIN and GARZA, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

This case turns on a single question of law: is an employer liable for the fraudulent misrepresentations of his employee made to further the employee's peculations while apparently acting for the employer in the course of the employer's business? Our jurisdiction being founded on diversity, as surrogate Louisiana judges we conclude that Louisiana courts would visit responsibility on the employer, and we, therefore, affirm the judgment of the district court finding the employer liable. Finding that the district court did not allow the injured third party the full measure of damages due, however, we reverse and remand for the entry of judgment in the larger amount we find owing.

I.

Home Life Insurance Company ("Home Life") provided group medical benefits insurance coverage for the employees of Equitable Equipment Company ("Equitable," now Equitable Shipyards, Inc.). As is customary in administering such group policies, Equitable provided the insurance administrator to prepare and handle claims. These duties were performed by an Equitable employee, Bernard Sciambra. Equitable employees who made claims under the group medical coverage filled out and signed the employee portion of the claim form supplied to them, asked their physician to sign another part of that form, and attached required supporting documents, such as medical expense bills. They submitted the documents to Sciambra for processing. It was Sciambra's duty to verify that the employee-claimant was covered, sign the employer portion of the form, and forward the form to Home Life's regional claims office in Atlanta. There, Home

Life's claims personnel further processed the claim, prepared payment drafts, and returned them by mail to Sciambra. Upon receiving the draft from Home Life's Atlanta office, Sciambra delivered it to the claimant.

Sciambra submitted a mixture of valid and fraudulent claims to Home Life. The bogus claims were contrived in a variety of ways that involved altering only portions of valid supporting documents, such as exaggerating medical facts and conclusions, increasing the length of time and unit rates of cost involved, fabricating documents, and forging signatures of claimants and physicians. Sciambra was the sole perpetrator of the fraud on some false claims. In these cases, when Sciambra altered valid claims, the claimants were completely unaware of his fraud, and Sciambra pocketed the proceeds. In most instances, however, Sciambra conspired with the claimant. When Home Life's payment draft on a fraudulent claim arrived, Sciambra obtained the signature of his co-conspirator, cashed the draft, and split the money with the named claimant.

When Home Life raised Equitable's premiums as a result of a high loss experience, Equitable investigated and learned of Sciambra's misdeeds. Equitable fired Sciambra. He and his co-conspirators were prosecuted for federal crimes. Sciambra was convicted and sentenced to imprisonment. He has now served his time and has been released from prison.

Some restitution to Home Life has been made by Sciambra and certain of his co-conspirators. But Home Life sustained a net loss in connection with the money it paid out on the fraudulent claims over the years. Home Life, therefore, sued Equitable and Sciambra jointly in the instant action, for recoupment of that loss. Equitable denied any liability to Home Life, but alternatively sought indemnity against Sciambra.

After a bench trial, the district court judge rendered judgment for Home Life in the amount of $34,706.63 against Sciambra and Equitable, and for Equitable against Sciambra in like amount. Equitable was expressly exonerated of negligence in hiring and supervising of Sciambra and in failing to learn of his fraudulent activity, but was cast solely on the basis of vicarious liability.

## II.

■ Article 2320 of the Louisiana Civil Code sets forth the Louisiana equivalent of the common law rule of *respondeat superior*. That article provides in relevant part:

> Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.

La.Civ.Code Ann. art. 2320 (West 1979). We need consider, therefore, only whether the harm Sciambra visited on Home was "occasioned . . . in the exercise of the functions in which [he was] employed."

In *LeBrane v. Lewis*, 292 So.2d 216 (La. 1974), Justice Tate (now Judge Tate of this court) held that a supervisor's intentional stabbing of a recently discharged employee was within the scope of the supervisor's employment, thus rendering the employer liable for the injuries inflicted by the supervisor. In reaching this conclusion, Justice Tate stated, "the tortious conduct of the supervisor was so closely connected in time, place, and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests." *Id.* at 218.[1]

---

1. One Louisiana appellate court has interpreted *LeBrane* as setting forth a four-part test to determine whether the employee was acting within the scope of employment:

   (1) Whether the tortious act was primarily employment-rooted;

   (2) Whether the [act] was reasonably incidental to the performance of the employee's duties;

   (3) Whether the act occured on the employer's premises; and

   (4) Whether it occurred during the hours of employment.

ment as defined by article 2320, *LeBrane*, and *Miller*, and Equitable is liable for his conduct.[3]

This holding accords with the result in *Riley v. Wiseman*, 395 So.2d 384 (La.Ct.App. 1981). There the court held that the employer-insurance agency was liable for the damage resulting from the issuance of bogus performance bonds by its employee: the employee's actions "although personally motivated, were so closely interwoven with his employer's business that it can be said to be 'a risk of harm fairly attributable to the employer's business.'" *Id.* at 387 (quoting *Mays v. Pico Fin. Co.*, 339 So.2d 382 (La.Ct.App.1976), *writ denied*, 341 So.2d 1123 (La.1977)).[4]

■ The same result would obtain under the common law concept of *respondeat superior* which is virtually identical to the civil law concept of vicarious liability set forth in article 2320.[5] The Restatement

---

*Miller v. Keating*, 339 So.2d 40, 44 (La.Ct.App. 1976). The Supreme Court of Louisiana considered the test applied by the court of appeals, however, and stated:

> We did not mean to suggest in *LeBrane* that in all cases of an employer's vicarious liability for the intentional torts of his employee that these four inclusive factors must be met before liability can be found. . . . It was our general evaluation of the circumstances of the tort in *LeBrane* as being one which evolved out of a dispute relating to the employment, one which was reasonably incident to the steward's duties as a hotel employee, and one which was closely connected to those duties (rather than a purely personal matter) which prompted us to regard the incident as one where the risk of harm was fairly attributable to the employer's business.

*Miller v. Keating*, 349 So.2d 265, 268–69 (La. 1977).